**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CASE NO. ______________________

MATTHEW S. BARRY and BARBARA G. PIERCE, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

MILLENNIUM PHYSICIAN GROUP, LLC, and MILLENNIUM HEALTHCARE, LLC,

Defendants.
________________________________/

CLASS ACTION

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs Matthew S. Barry ("Plaintiff Barry") and Barbara G. Pierce ("Plaintiff Pierce") (together, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members," or the "Class"), bring this Class Action Complaint against Defendants Millennium Physician Group, LLC ("MPG") and Millennium Healthcare, LLC ("Millennium Healthcare") (together, "Millennium" or "Defendants"), and allege as follows based on personal knowledge as to Plaintiffs' own acts and on information and belief as to all other matters:

## NATURE OF THE ACTION

1. This is a class action arising from Millennium's disclosure of its patients' and prospective patients' sensitive health-related communications to

Google LLC ("Google"), without notice or consent, through tracking technologies Millennium deployed on its website, www.millenniumphysician.com (the "Website").

2. Millennium is one of the largest physician groups in the Southeast. Headquartered in Tampa, Florida, it has more than 900 providers practicing in Florida, Georgia, Texas, and North Carolina and generates approximately $600 million in annual revenue. Through the Website, patients and prospective patients locate Millennium physicians by name and specialty and begin the process of scheduling appointments with them.

3. Scheduling is the Website's core function. "Find a Doctor" and "Make an Appointment" are the primary calls to action on the Website's homepage. A visitor who uses "Find a Doctor" opens a specific physician's profile, which identifies the physician and his or her medical specialty; clicks "Schedule Appointment"; answers the Website's question, "Have you been seen by a Millennium Physician Group provider in the last 3 years?," by selecting either "Yes, I Am A Returning Patient" or "No, I Am A New Patient"; and then selects his or her insurance type—"Medicare," "Medicare Advantage," or "Other."

4. Unbeknownst to visitors, Millennium reports each of those steps to Google in real time. Millennium has configured Google Analytics so that the clicks a visitor makes in the scheduling flow fire an event, named "link_click," that transmits

to Google the verbatim text of the button the visitor clicked and the physician-specific address to which it leads. Google thereby learns the specific physician the visitor is trying to see, whether the visitor is already a Millennium patient, and the visitor's insurance type—including whether the visitor is a Medicare beneficiary. Every one of those events is tied to a persistent Google identifier. And the physician-specific scheduling page also fires Google's DoubleClick advertising tag, which reports the scheduling page to Google's advertising servers together with Google advertising cookies that identify the visitor's browser and, for visitors signed into Google, their Google accounts.

5. Millennium tells the public the opposite. Its "Legal Disclaimers" page assures visitors that "[c]onfidentiality of data relating to individual patients and visitors to a medical/health Web Site . . . is respected by this Web Site," that "Millennium Physician Group is committed to protecting our patient's Protected Health Information and will abide by all HIPAA laws," and that "[t]his Site does not host or receive funding from advertising." Its HIPAA Notice of Privacy Practices tells patients that Millennium is "expressly prohibited from using or disclosing your protected health information for marketing purposes." And the website privacy policy issued by Millennium Healthcare promises that patients' health information will not be used or disclosed "for advertising, marketing, or other use-based data mining purposes"—while treating that information as confined to a password-

protected patient portal, as though a patient's selection of her own physician, her status as a Millennium patient, and her insurance on the public scheduling flow were not health information at all.

6. Visitors are never asked to agree to any of this. The Website presents no Terms of Use, and visitors are not asked to click through any cookie banner, pop-up, checkbox, or clickwrap agreement before their communications are transmitted to Google. The transmissions begin the instant a page loads or a button is clicked—before any visitor could locate, much less read, Millennium's footer-linked privacy documents. None of those documents discloses that a visitor's physician selection, patient status, and insurance type are sent to Google's analytics and advertising systems as the visitor tries to schedule care.

7. This interception of private electronic communications occurs without appropriate notice to visitors and without their prior consent, in violation of (1) the Florida Security of Communications Act, Fla. Stat. § 934.01, *et seq.* ("FSCA"), and (2) the federal Electronic Communications Privacy Act, 18 U.S.C. § 2511, *et seq.* ("ECPA").

8. Under the FSCA, it is unlawful to intentionally intercept, endeavor to intercept, or procure any other person to intercept any wire, oral, or electronic communication without the prior consent of all parties to the communication. A knowing violation is a third-degree felony. Fla. Stat. § 934.03(4)(a). Millennium

violated the FSCA by deliberately embedding tracking technologies on its Website that procured Google to intercept visitors' private electronic communications—including the physicians they sought, their status as Millennium patients, and their insurance types—in real time, without the knowledge or prior consent of any party to those communications.

9. Under the ECPA, similar protections exist at the federal level. Although the ECPA contains a one-party consent exception, that exception does not apply here because Millennium procured the interceptions for the purpose of committing criminal and tortious acts—including the unauthorized use and disclosure of individually identifiable health information for commercial advantage in violation of the Health Insurance Portability and Accountability Act ("HIPAA"), 42 U.S.C. § 1320d-6, and the tortious breach of the confidence its patients reposed in it.

10. Independent of these statutory violations, Millennium owed Plaintiffs and Class Members a duty of confidence and breached it. Plaintiffs are Millennium patients. They and other Class Members communicated with Millennium through its Website for the purpose of locating, and scheduling care with, Millennium physicians. Millennium accepted that trust and then disclosed those nonpublic communications to an advertising and analytics company with no role in furnishing care—without consent or privilege.

11. Further, Millennium solicited and obtained visitors' sensitive health-related data directly from them and put that data to use for analytics, advertising, conversion-measurement, and patient-acquisition purposes, without ever compensating visitors for the value it received. Millennium has thereby been unjustly enriched at Plaintiffs' and Class Members' expense.

12. Millennium's conduct is also an unfair and deceptive trade practice. Plaintiffs therefore assert a claim under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq*. ("FDUTPA")—solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) makes available to "anyone aggrieved by a violation" of the Act, and expressly not for damages.

13. Through this action, Plaintiffs seek to hold Millennium accountable for these privacy violations, to obtain appropriate remedies for affected individuals, and to stop Millennium's continued procurement of the interception of electronic communications through its Website.

## PARTIES

14. Plaintiff Matthew S. Barry is an adult citizen and resident of the State of Florida, residing in North Port, Sarasota County, Florida. Plaintiff Barry has been a Millennium patient for several years.

15. Plaintiff Barbara G. Pierce is an adult citizen and resident of the State of Florida, residing in Venice, Sarasota County, Florida. Plaintiff Pierce is a longtime Millennium patient.

16. Defendant Millennium Physician Group, LLC is a Florida limited liability company (Fla. Dep't of State Doc. No. L08000011177) whose principal place of business, as listed with the Florida Department of State, is 2502 North Rocky Point Drive, Suite 890, Tampa, Florida 33607, in Hillsborough County. MPG operates primary-care, specialty, and walk-in practices with more than 900 providers in Florida, Georgia, Texas, and North Carolina, including clinical offices in Sarasota County. MPG is a health care provider and a HIPAA covered entity, and it is identified as a member of Millennium's Affiliated Covered Entity in the Notice of Privacy Practices published on the Website. The physicians whose profiles and scheduling pages appear on the Website are MPG's physicians.

17. Defendant Millennium Healthcare, LLC is a Florida limited liability company (Fla. Dep't of State Doc. No. L13000127498) whose principal place of business, as listed with the Florida Department of State, is the same address: 2502 North Rocky Point Drive, Suite 890, Tampa, Florida 33607. Millennium Healthcare issues the Website's privacy policy in its own name. It owns the federally registered "MILLENNIUM PHYSICIAN GROUP," "MILLENNIUM," and "MPG" trademarks under which the Website and MPG's practices operate. And the Notice

of Privacy Practices published on the Website speaks in the name of "Millennium Healthcare and the members of its Affiliated Covered Entity." On information and belief, Millennium Healthcare owns, develops, maintains, operates, and controls the Website, including the tracking technologies deployed on it.

18. MPG and Millennium Healthcare are under common ownership and control. They share the same principal address and the same registered agent, and their officers overlap, with the same individuals listed as officers of both entities. They hold themselves out to the public as a single enterprise, "Millennium," under the same name, brand, and website. At all relevant times, each Defendant acted as the agent of the other and within the scope of that agency, and each participated in, authorized, ratified, or benefited from the conduct alleged in this Complaint. The precise allocation of responsibility for the Website and its tracking technologies between them is within Defendants' exclusive knowledge. Unless otherwise stated, references in this Complaint to "Millennium" refer to both Defendants, and each allegation regarding Millennium is made against each Defendant.

## JURISDICTION AND VENUE

19. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges claims arising under federal law, namely the ECPA, 18 U.S.C. § 2511, *et seq.*

20. This Court has supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution. All of Plaintiffs' claims arise from the same nucleus of operative fact: Millennium's deployment of the same tracking technologies on the same Website.

21. This Court has personal jurisdiction over Defendants because each is a Florida limited liability company with its principal place of business in Tampa, Florida, within this District, and because Defendants operate and control the Website from Florida. The acts and omissions giving rise to Plaintiffs' claims occurred in and emanated from Florida.

22. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2). All Defendants reside in this District, where each maintains its principal place of business. A substantial part of the events or omissions giving rise to the claims also occurred in this District: Plaintiffs accessed the Website and communicated with Millennium from Sarasota County, within this District, where the Trackers' code executed on their devices and the interception of their communications occurred.

23. Assignment to the Tampa Division is proper under Local Rule 1.04(b) because the action is most directly connected to, and most conveniently advanced in, the Tampa Division. Defendants' principal place of business is in Hillsborough

County, within the Tampa Division. Both Plaintiffs reside in Sarasota County, within the Tampa Division, used the Website there, and had their communications intercepted there. And Millennium maintains clinical offices in Sarasota County, where it provides care to Plaintiffs and other Sarasota County residents who use the Website to locate and schedule care with Millennium physicians.

## FACTUAL ALLEGATIONS

### A. Overview of Website Tracking on Healthcare Websites

24. Many websites employ tracking technologies that collect personal data about users' online activities. In the healthcare context, these technologies are particularly concerning because they can capture sensitive medical information, including the specific physicians and specialists a user is seeking, whether the user is already a patient of a particular provider, how the user pays for health care, and the conditions a user or a user's loved one may be experiencing.

25. The concern is at its highest on a medical practice's own website. A patient who searches a physician group's website for a doctor, opens that doctor's profile, clicks to schedule an appointment, tells the practice that she is a returning patient, and identifies how she will pay for her care is not browsing idly; the patient is communicating with her health care provider about the care she needs. The interception of those communications reveals personal health information, treatment

relationships, and care-seeking behavior to third parties without patients' knowledge or consent.

26. As detailed below, Millennium has implemented tracking technologies on its Website that result in Google's unauthorized interception of visitors' electronic communications.

**B. Millennium's Website and Its Scheduling Flow**

27. The Website is Millennium's primary digital channel for patients and prospective patients. According to Similarweb traffic data, the Website received 650,327 visits from May through July 2026—approximately 216,800 visits per month—with more than 97% of that traffic originating in the United States. That equates to roughly 211,000 U.S. visits per month and approximately 2.5 million U.S. visits per year.

28. "Find a Doctor" and "Make an Appointment" are the primary calls to action on the Website's homepage, and searches for Millennium physicians by name account for a dominant share of the Website's organic search traffic. The Website exists, above all, to connect visitors with specific Millennium physicians and to begin scheduling care with them.

29. Each Millennium physician has a dedicated profile page on the Website. The address of each profile page takes the form millenniumphysician.com/doctor/[physician-name]/. Each profile identifies the physician by name and

credentials, states the physician's medical specialty—for example, "Hospitalist, Internal Medicine, Primary-Care"—lists the physician's office locations, and displays a "Schedule Appointment" button.

30. Clicking "Schedule Appointment" takes the visitor to a physician-specific scheduling page with an address of the form millenniumphysician.com/schedule-appointment-doctor/?d_post_id=[number], in which the "d_post_id" value uniquely identifies the physician with whom the visitor is seeking to schedule. The page bears the title "Doctor Schedule Appointment | Millennium Physician Group" and displays the physician's name, photograph, and specialty.

31. The scheduling page first asks the visitor, "Have you been seen by a Millennium Physician Group provider in the last 3 years?," and requires the visitor to click one of two buttons: "Yes, I Am A Returning Patient" or "No, I Am A New Patient." Each answer is a complete statement, in the visitor's own voice, of the visitor's relationship with Millennium.

32. The scheduling page then asks the visitor to select an insurance type by clicking one of three buttons: "Medicare," "Medicare Advantage," or "Other." Eligibility for Medicare is generally limited to individuals who are 65 or older or who have a qualifying disability or end-stage renal disease, so a visitor's selection of Medicare or Medicare Advantage reveals not only how the visitor will pay for care but also facts about the visitor's age or health.

33. Depending on the physician and the visitor's selections, the scheduling page then routes the visitor to Millennium's scheduling team—for example, by displaying a message that the physician "is not currently scheduling new patient appointments online" and inviting the visitor to "click below to be connected with our scheduling team" by clicking a "Call Now" button.

34. Accordingly, the pages a visitor requests in this flow, and the buttons the visitor clicks on them, reveal the substance of the visitor's communications with Millennium: the specific physician the visitor is seeking, that physician's specialty, whether the visitor has been a Millennium patient within the last three years, the visitor's insurance type, and the visitor's steps to obtain care from that physician.

### C. The Tracking Technologies Deployed on the Website

35. Google is a multinational technology company headquartered in Mountain View, California. Google operates one of the world's largest online advertising platforms and generates most of its revenue through targeted advertising. Millennium has implemented Google's analytics and advertising technologies on its Website—including Google Analytics 4 ("Google Analytics") and Google's DoubleClick advertising conversion and remarketing tag ("DoubleClick")—deployed through Google Tag Manager (together, the "Trackers").

36. Google Analytics is a web analytics service that allows website operators to track visitors' actions on their websites in order to measure traffic and

engagement, personalize content, and support targeted advertising. It is a JavaScript-based technology that loads automatically and immediately whenever a user visits a page containing the code, and it executes in the user's own browser, on the user's own device, in the background and without any visible indication to the user. Google Analytics transmits each "event" it records to Google's collection endpoint (in "collect?v=2" requests), with parameters that include the event name ("en"), the address of the page on which the event occurred ("dl," or document location), the page from which the visitor arrived ("dr," or document referrer), the page title ("dt," or document title), and any custom event parameters configured by the website operator (designated by the prefix "ep.").

37. Every Google Analytics request also carries the Google Analytics client identifier ("cid"), a persistent identifier stored in a cookie on the visitor's browser. The client identifier remains constant as the visitor navigates the Website and across return visits, enabling Google to link each of the visitor's interactions to the same browser and to the same visitor.

38. DoubleClick is Google's advertising-serving and measurement platform. The DoubleClick tag on the Website sends requests to Google's advertising endpoint at googleads.g.doubleclick.net/pagead/viewthroughconversion/11417271251/, where "11417271251" identifies Millennium's own Google Ads account. Those requests report the page the visitor is

viewing so that Google can attribute the visit to Millennium's advertising and, on information and belief, add the visitor to advertising audiences for remarketing. Because the requests go to a Google advertising domain, the visitor's browser attaches Google's advertising cookies to them, including the "IDE" cookie, which Google uses to identify a browser for advertising purposes, and the "DSID" cookie, which is associated with the visitor's signed-in Google account.

39. Google's privacy disclosures confirm that it uses the data it collects to advertise and market to users, including by targeting advertising and combining data collected from different contexts. For Google, a visitor's pursuit of a particular physician, status as a patient, and insurance type are not incidental to some service performed for Millennium; they are advertising signals.

40. The Website also loads code operated by other third-party vendors, including a call-routing widget invoked by the "Call Now" button. The full extent of other third parties' receipt and use of visitors' communications is a subject for discovery.

### D. Millennium Discloses Visitors' Scheduling Communications to Google

41. When a visitor loads a page on the Website, the visitor's browser sends an HTTP request to the Website's server. In response, the server returns the webpage, which contains small pieces of code known as trackers, tags, or pixels. That code executes in the visitor's browser and instructs it to send the visitor's

interactions—along with identifying data such as cookies, browser details, and device information—to Google, in real time and in parallel with the visitor's communications with Millennium.

42. Plaintiffs' counsel's pre-suit investigation, conducted in or around September 2026 using the Google Chrome browser's DevTools Network panel and the corresponding HAR (HTTP Archive) file, documented these transmissions on the Website's "Find a Doctor" and scheduling flow. The recording is offered to demonstrate the Website's functionality and the manner in which the Trackers transmit visitors' communications. It is not offered as a record of any specific prior visit by any Plaintiff, and Plaintiffs' claims do not rest on it. It confirms that the conduct described in this Complaint is ongoing. The figures that follow are drawn from that recording; the red boxes highlighting relevant parameters were added by counsel.

43. The session began on the Website's "Get Care Now" page. From there, the user opened "Find a Doctor" and clicked "View Profile" for a Millennium physician whose profile identifies his specialty as "Hospitalist, Internal Medicine, Primary-Care" (the "Demonstration Physician"). As shown in Figure 1, that click caused the browser to transmit to Google Analytics a "link_click" event (en=link_click) carrying the button's text (ep.link_text="View Profile"), the address of the Demonstration Physician's profile, which contains his name (ep.link_url=

https://millenniumphysician.com/doctor/aaron-josephson-do/), the "Find A Doctor" page on which the click occurred, and the user's persistent Google Analytics client identifier (cid=1848770922.1785664626).




*Figure 1: Clicking "View Profile" on "Find a Doctor" sends Google Analytics a "link_click" event carrying the button text (ep.link_text), the physician's profile address (ep.link_url), and the persistent client identifier (cid).*

44. The user then clicked "Schedule Appointment" on the Demonstration Physician's profile. As shown in Figure 2, that click transmitted another "link_click" event to Google Analytics, carrying the button's text (ep.link_text="Schedule Appointment"), the physician-specific scheduling address (ep.link_url=https://millenniumphysician.com/schedule-appointment-doctor/?d_post_id=24379), and the same client identifier.




*Figure 2: Clicking "Schedule Appointment" sends Google Analytics the physician-specific scheduling address (ep.link_url) and the button text (ep.link_text) under the same client identifier (cid).*

45. On the scheduling page, in response to the question, "Have you been seen by a Millennium Physician Group provider in the last 3 years?," the user clicked "No, I Am A New Patient." As shown in Figure 3, that click transmitted a "link_click" event to Google Analytics carrying the user's verbatim answer (ep.link_text="No, I am a New Patient"), the physician-specific scheduling address on which that question is posed (dl=https://millenniumphysician.com/schedule-appointment-doctor/?d_post_id=24379), the page title (dt="Doctor Schedule Appointment | Millennium Physician Group"), the "Find a Doctor" referrer, and the same client identifier.




*Figure 3: The user's answer to the patient-status question ("No, I am a New Patient") is sent to Google Analytics with the physician-specific scheduling address (dl) and the same client identifier (cid).*

46. The user then selected "Medicare" as the insurance type. As shown in Figure 4, that click transmitted a "link_click" event to Google Analytics carrying the user's verbatim insurance selection (ep.link_text="Medicare"), the physician-specific scheduling address, the page title, and the same client identifier.




*Figure 4: The user's insurance selection ("Medicare") is sent to Google Analytics with the physician-specific scheduling address (dl) and the same client identifier (cid).*

47. The Website then displayed the message that the Demonstration Physician "is not currently scheduling new patient appointments online" and invited the user to be connected with Millennium's scheduling team. When the user clicked "Call Now," the browser transmitted a further "link_click" event to Google Analytics carrying the button's text (ep.link_text="Call Now") and the physician-specific scheduling address (ep.link_url=https://millenniumphysician.com/schedule-appointment-doctor/?d_post_id=24379#cp-widget), under the same client identifier, as shown in Figure 5.




*Figure 5: Clicking "Call Now" sends Google Analytics the button text (ep.link_text) and the physician-specific scheduling address (ep.link_url) under the same client identifier (cid).*

48. Separately, loading the physician-specific scheduling page caused the browser to send a request to Google's DoubleClick advertising endpoint, googleads.g.doubleclick.net/pagead/viewthroughconversion/11417271251/. As shown in Figure 6, that request carried the physician-specific scheduling address (url=https://millenniumphysician.com/schedule-appointment-doctor/?d_post_id= 24379), the "Find a Doctor" referrer (ref=https://millenniumphysician.com/find-a-doctor/), and the page title (tiba="Doctor Schedule Appointment | Millennium Physician Group").




*Figure 6: Loading the scheduling page sends Google's DoubleClick advertising endpoint the physician-specific scheduling address (url), the "Find a Doctor" referrer (ref), and the page title (tiba).*

49. As shown in Figure 7, the DoubleClick request was sent cross-site from the Website (Origin: https://millenniumphysician.com) to Google's advertising domain, and its request headers carried Google's "IDE" advertising cookie and "DSID" cookie. Google therefore received the physician-specific scheduling page together with cookies that identify the user's browser for advertising purposes and that are associated with the user's signed-in Google account.




*Figure 7: The DoubleClick request is sent cross-site from the Website to Google's advertising domain with Google's "IDE" and "DSID" cookies in the request headers.*

50. In the course of a single visit, therefore, Google learned that a browser it could persistently recognize—and, through its advertising cookies, could link to an advertising profile and a Google account—had sought out a specific Millennium physician, had begun scheduling with that physician, had told Millennium whether it was an existing patient, had identified its insurance type as Medicare, and had clicked to call Millennium's scheduling team. Those are the steps of a patient seeking care from a specific physician.

51. Millennium's own transmissions confirm that no consent had been obtained. The Google Analytics requests shown in Figure 1 carry the parameter "npa=0," Google's flag indicating that the request is not restricted to non-personalized advertising, and a Google consent-mode value ("gcd=13l3l3l3l1l1")

that, on information and belief, reflects that no consent signal of any kind had been set for advertising storage, analytics storage, user data, or ad personalization at the moment of transmission. No Terms of Use, cookie banner, consent prompt, or other request for permission was presented to the user at any point before or during these transmissions.

52. These transmissions are not the "session replay" recordings of mouse movements, clicks, scrolling, and keystrokes that some courts have found to fall outside the FSCA. The Trackers do not record where a visitor's cursor moves or how a visitor scrolls. They acquire and transmit the words of the visitor's communications themselves—the verbatim text of the answer the visitor selected in response to Millennium's question, and the address and title of the physician-specific page on which that question is posed—so that Google learns the substance of what the visitor told Millennium. Nor do the Trackers track the physical movement of any person or object; they capture content.

### E. Every Selection in the Scheduling Flow Is Transmitted in the Same Manner

53. The transmissions are not limited to the particular buttons clicked in the demonstration session. Each step of the scheduling flow presents the visitor with alternative buttons on the same page—"Yes, I Am A Returning Patient" alongside "No, I Am A New Patient," and "Medicare Advantage" and "Other" alongside "Medicare." The capture shows that, at each of those steps, the button the user

clicked fired a "link_click" event transmitting that button's text to Google. The event captures the text of whatever button is clicked; it is not tied to any particular answer.

54. On information and belief, every button in the Website's scheduling flow—including "Yes, I Am A Returning Patient," "Medicare Advantage," and "Other"—fires the same "link_click" event and transmits to Google the verbatim text of the button clicked, the physician-specific scheduling address, the page title, and the visitor's persistent Google Analytics client identifier, in the same manner shown in Figures 1 through 5. On information and belief, the same is true of every physician profile and every physician-specific scheduling page on the Website, each of which is generated from the same templates and governed by the same tag configuration, and each of which fires the DoubleClick request shown in Figures 6 and 7.

55. A visitor who clicks "Yes, I Am A Returning Patient" thus tells Google that he or she has been seen by a Millennium provider within the last three years—disclosing the existence of the patient's treatment relationship with Millennium itself—together with the specific Millennium physician with whom the patient is seeking to schedule and the patient's insurance type.

### F. Defendants' Responsibility for the Interception of Electronic Communications

56. Although the Trackers perform the technical acquisition and transmission functions, Millennium is legally responsible under the FSCA and the

ECPA because it intentionally procured, enabled, directed, authorized, and caused Google to acquire the challenged communications.

57. Millennium knowingly made the affirmative decision to implement the Trackers on the Website. That implementation was deliberate and required Millennium, or persons acting on its behalf, to configure and deploy the code through Millennium's own Google Tag Manager container, Google Analytics property, and Google Ads account (11417271251).

58. The tracking here is not merely a generic page-view tag. "link_click" is not one of the events Google Analytics collects automatically, and "link_text" and "link_url" are custom event parameters. On information and belief, Millennium, or persons acting on its behalf, named, configured, and wired that event to fire when visitors click the buttons through which they select a physician, schedule with that physician, identify themselves as new or returning patients, and identify their insurance type. Millennium likewise placed its Google Ads conversion and remarketing tag on its physician-specific scheduling pages. Configuring a patient's scheduling selections to be reported to an analytics and advertising company is an engineering and marketing decision, not an incident of ordinary website operation.

59. Millennium controls, participates in controlling, or has the contractual and practical ability to control which pages and events on its Website trigger tracking. At minimum, Millennium could elect not to procure tracking on its

physician profiles and its scheduling flow—yet the captured requests show tracking operating on precisely those functions.

60. Without Millennium's implementation and continued operation of this code, Google would not have acquired the communications at issue.

### G. Millennium's Privacy Representations Promise Confidentiality and Do Not Authorize the Tracking

61. The Website does not present any Terms of Use or Terms of Service, and it contains no arbitration provision or class-action waiver governing a visitor's use of the Website. Visitors are not required to affirmatively agree to anything before searching for physicians, opening physician profiles, clicking to schedule, or answering the Website's patient-status and insurance questions. The Website's footer offers links titled "Compliance & Ethics," "Legal Disclaimers," and "Privacy Practices," among numerous others. None of the documents behind those links contains an arbitration provision, class-action waiver, or forum-selection or choice-of-law clause.

62. Millennium's "Legal Disclaimers" page affirmatively represents that the Website protects visitors' confidentiality and is not an advertising vehicle. It states that "[c]onfidentiality of data relating to individual patients and visitors to a medical/health Web Site . . . is respected by this Web Site"; that the Website's owners "will honour or exceed the legal requirements of medical/health information privacy" in the United States; that "Millennium Physician Group is committed to

protecting our patient's Protected Health Information and will abide by all HIPAA laws"; and that "[t]his Site does not host or receive funding from advertising."

63. The same page explains what Millennium considers confidential and when it may be shared: "Essentially any information that is patient-identifiable, even the patient's address, is confidential and must be protected," and "[o]nly when the patient has agreed may it be used or disclosed for specific purposes." It further represents that access to confidential information is limited to "[o]nly those people who need access for business reasons and who have been authorized to receive it."

64. The Website's "Privacy Practices" page links to Millennium's HIPAA Notice of Privacy Practices, which speaks in the name of "Millennium Healthcare and the members of its Affiliated Covered Entity" and identifies MPG as a member of that Affiliated Covered Entity. The Notice represents that "[w]e will maintain the privacy of your protected health information"; that "we are expressly prohibited from using or disclosing your protected health information for marketing purposes"; that "[w]e may not sell your protected health information without your authorization"; and that if any use or disclosure "goes beyond" treatment, payment, and operations, "we will not use or disclose your PHI without your authorization."

65. The "Privacy Practices" page also links to a "Corporate Website Privacy Policy" (the "Online Privacy Policy") issued in the name of Defendant Millennium Healthcare. The current version bears an effective date of August 25,

2026—after the visits at issue, including Plaintiff Barry's. The Online Privacy Policy is accessible only through a footer link and a second click, where visitors have no occasion to encounter it before their communications have already been transmitted. It is a passive browsewrap document that no visitor is asked to accept. Browsewrap terms bind a user only where the hyperlink to them is conspicuous enough to put a reasonably prudent person on inquiry notice before engaging with the website. Millennium's footer link fails that test.

66. Even if it were enforceable, the Online Privacy Policy does not disclose, and cannot constitute consent to, the conduct alleged here. It states only in general terms that Millennium uses Google Analytics "to understand and evaluate how visitors interact with" the Website, and that "[w]e and third parties may use session and persistent cookies for analytics and advertising purposes." It does not disclose that the physician a visitor selects, the visitor's status as a new or returning Millennium patient, and the visitor's insurance type are transmitted in real time to Google, keyed to persistent identifiers and to Google advertising and account cookies.

67. To the contrary, the Online Privacy Policy tells visitors that their health information is handled elsewhere and is off-limits to advertising. It states that it does not apply to information collected through Millennium's password-protected patient portal (the "Secure Platform"), which it describes as protected health information

governed by Millennium's HIPAA notice, and it promises: "We will not use or disclose information collected from the Secure Platform . . . for advertising, marketing, or other use-based data mining purposes," and "We will not sell any PHI." The Online Privacy Policy thereby treats a patient's selection of her own physician, her status as a Millennium patient, and her insurance type—communicated through the public scheduling flow—as ordinary "website activity" rather than as the health information it is, and it discloses nothing about the transmissions documented above.

68. Consent is limited to the specific conduct authorized, and under the FSCA it must be given by every party before the interception occurs. No visitor gave it here. The Trackers transmit visitors' communications on page load and on each click, before any visitor could reach the footer-linked documents, and the scheduling flow presents no consent control at any point. And a reasonable person who did read Millennium's representations that the Website respects the confidentiality of "patients and visitors," that Millennium will "abide by all HIPAA laws," that the Website "does not host or receive funding from advertising," and that health information will not be used for advertising would not understand a generic reference to analytics and advertising cookies to authorize the real-time transmission of the physician she is seeking, her patient status, and her insurance type to Google's

analytics and advertising systems, joined to identifiers by which Google recognizes her.

### H. Millennium’s Conduct Violates HIPAA

69. Plaintiffs do not assert any claim under HIPAA, and they do not contend that HIPAA supplies a private right of action. The HIPAA allegations in this Section are pleaded for three limited purposes only: (1) to establish the sensitive and protected character of the information Millennium caused to be disclosed; (2) to establish Millennium’s knowledge that disclosing it was unlawful; and (3) to establish the criminal purpose that takes the interception outside the one-party consent exception of 18 U.S.C. § 2511(2)(d).

70. MPG, and each member of Millennium’s Affiliated Covered Entity, is a covered entity under HIPAA within the meaning of 45 C.F.R. § 160.103. MPG is a health care provider that furnishes, and bills for, health care through its physician practices, and it transmits health information electronically in connection with covered transactions. As a covered entity, MPG is subject to HIPAA’s prohibitions on the unauthorized use and disclosure of protected health information (“PHI”), 45 C.F.R. § 164.502(a), and to the Privacy Rule’s requirement of a written authorization for any use or disclosure of PHI for marketing, 45 C.F.R. § 164.508(a)(3). Millennium’s own Notice of Privacy Practices, published on the Website, reflects its recognition of those obligations. To the extent Millennium Healthcare operates the

Website on MPG's behalf, it does so as MPG's affiliate or business associate and is bound by the same restrictions.

71. PHI is defined as "individually identifiable health information" that is (i) transmitted by electronic media; (ii) maintained in electronic media; or (iii) transmitted or maintained in any other form or medium. 45 C.F.R. § 160.103. Individually identifiable health information ("IIHI") is health information that (1) is created or received by a health care provider, health plan, employer, or health care clearinghouse; (2) relates to an individual's past, present, or future physical or mental health or condition, the provision of health care to an individual, or the past, present, or future payment for the provision of health care to an individual; and (3) either identifies the individual or provides a reasonable basis to believe the individual can be identified. *Id.*

72. The information at issue satisfies the first two prongs. It is received by Millennium, a health care provider, through its own Website. And when a patient opens the profile of the Millennium physician who treats or will treat him or her, clicks to schedule with that physician, tells Millennium whether he or she has been seen by a Millennium provider within the last three years, and identifies his or her insurance type, the patient discloses information relating to the provision of health care to him or her by Millennium and to the payment for that care. A visitor's identification of himself or herself as a returning patient discloses the existence of a

treatment relationship with Millennium; a visitor's selection of Medicare or Medicare Advantage discloses the source of payment for his or her care and, by extension, facts about his or her age or health. That is especially so for Plaintiffs and other Class Members who are existing Millennium patients, whose Website communications concern the physicians from whom they receive care.

73. The identifiers transmitted alongside those communications satisfy the third prong. HIPAA's de-identification provision treats a "unique identifying number, characteristic, or code" as an identifier that must be removed for information to qualify for the regulatory safe harbor. 45 C.F.R. § 164.514(b)(2)(i). The Google Analytics client identifier and the IDE and DSID cookies described above are persistent codes capable of linking the same browser, device, account, or user across interactions. Transmitted in the same requests as, or tied by the same identifiers to, the physician, patient-status, and insurance information—and combined with information available to Google—those identifiers provide a reasonable basis to believe the individual can be identified. The allegation is especially concrete where, as with Plaintiff Barry, the visitor was signed into a Google account, because Google's account-associated cookies link the communication to the visitor's authenticated Google identity. *See Kane v. Univ. of Rochester*, 2024 WL 1178340 (W.D.N.Y. Mar. 19, 2024).

74. The health-related information intercepted from the Website is highly sensitive. It reveals the specific physicians and specialists patients are seeking, the existence of patients' treatment relationships with Millennium, and patients' insurance and Medicare status. The disclosure of this information to an advertising and analytics company exposes patients to privacy invasions and to the risk of stigma, discrimination, and targeted exploitation.

75. HIPAA criminalizes the knowing disclosure of individually identifiable health information in violation of HIPAA, with enhanced penalties where the offense is committed with intent to sell, transfer, or use the information for commercial advantage, personal gain, or malicious harm. 42 U.S.C. § 1320d-6. Millennium did not deploy or procure the Trackers merely for passive website maintenance. It selected and used them to obtain analytics, advertising, conversion-measurement, remarketing, and patient-acquisition benefits by transmitting patients' physician, patient-status, and insurance communications to Google—including by placing its Google Ads conversion and remarketing tag on its physician-specific scheduling pages. Those facts support the inference that a purpose of the challenged interception was to disclose and use individually identifiable health information for commercial advantage, and that the HIPAA offense was independent of the interception prohibited by the ECPA.

76. Millennium did not obtain HIPAA-compliant authorizations from visitors for these disclosures. To the extent Millennium contends that Google acted as its business associate for any challenged tracking function, the existence, scope, and terms of any business associate agreement are facts particularly within Millennium's and Google's possession. On information and belief, no agreement or other arrangement authorized Google to receive and use the challenged information for its own advertising, profiling, remarketing, or other independent commercial purposes, and a business associate agreement would not itself authorize uses or disclosures outside HIPAA's permitted scope.

77. Millennium had actual and constructive knowledge that its deployment of third-party trackers on its Website transmitted PHI to third parties in violation of HIPAA. In December 2022, and as updated in March 2024, the U.S. Department of Health and Human Services, Office for Civil Rights, issued guidance warning HIPAA-covered entities that the use of third-party tracking technologies on their websites—including pixels and analytics tools—that transmit PHI to third-party vendors without a HIPAA-compliant authorization or business associate agreement constitutes an impermissible disclosure. Although a federal court later vacated a portion of that guidance addressing the transmission of an IP address together with a visit to an unauthenticated webpage, without more, *see Am. Hosp. Ass'n v. Becerra*, No. 4:23-cv-01110-P (N.D. Tex. June 20, 2024), the transmissions here involve far

more: a visitor's specific physician, the visitor's own statement that he or she is or is not an existing Millennium patient, and the visitor's insurance type, joined to persistent identifiers. Millennium, which publishes its own HIPAA notice and represents on its Website that it "will abide by all HIPAA laws," cannot credibly claim ignorance of the well-publicized risks of placing tracking technologies on its scheduling flow. Its continued deployment of the Trackers reflects a knowing and deliberate choice to prioritize analytics and advertising benefits over its legal obligations.

78. The alleged interceptions do not depend on the transmission of IP addresses or generic analytics alone. The captured requests transmit the actual substance of visitors' communications—the physicians they sought, their status as Millennium patients, their insurance types, and their scheduling actions—together with persistent identifiers capable of linking those communications to the same browser, device, account, or user.

## I. Plaintiffs' Specific Experiences

***Plaintiff Matthew S. Barry***

79. Plaintiff Matthew S. Barry is a Florida resident who lives in North Port, Sarasota County, Florida. He has been a Millennium patient for several years.

80. In or around late February 2026, within the applicable limitations period, and on more than one occasion, Plaintiff Barry visited the Website to search

for and view the profiles of Millennium physicians—including primary-care physicians and specialists—from whom he sought care for his own health care needs. He also used the Website to look up Millennium's office locations and billing information.

81. During those visits, Plaintiff Barry opened Millennium physician profiles, clicked "Schedule Appointment," selected "Yes, I Am A Returning Patient" in response to the Website's patient-status question, and selected "Other" as his insurance type.

82. Plaintiff Barry was physically located in Florida during each of those visits. He accessed the Website from his Google Pixel mobile phone and his Windows desktop computer, using the Google Chrome browser on both devices, and the Trackers' code executed in his browser, on his devices, in Florida. He did not use an ad blocker, a virtual private network, or a private or "incognito" browsing mode, meaning the Trackers embedded on the Website were fully operational during his visits. He was signed into his Google (Gmail) account during his visits to the Website.

83. Before interacting with the Website, and at no point during his visits, was Plaintiff Barry presented with any Terms of Use, cookie banner, pop-up, checkbox, clickwrap, or other request for permission to disclose his communications

with Millennium to Google. Plaintiff Barry's visits preceded the August 25, 2026 effective date of the current Online Privacy Policy.

84. In the same manner documented above in Sections D and E and in Figures 1 through 7, the physician profiles and physician-specific scheduling pages Plaintiff Barry requested, and the buttons he clicked—including his selection of "Schedule Appointment," his verbatim answer "Yes, I Am A Returning Patient," and his insurance selection, "Other"—were intercepted in real time and transmitted to Google, together with his persistent Google Analytics client identifier and Google's advertising cookies. Because he was signed into his Google account, the Google cookies transmitted alongside those communications linked them to his authenticated Google identity.

***Plaintiff Barbara G. Pierce***

85. Plaintiff Barbara G. Pierce is a Florida resident who lives in Venice, Sarasota County, Florida. She has been a Millennium patient for many years, and she has used the Website over that time to find Millennium physicians when her circumstances changed.

86. Within the two years preceding the filing of this Complaint, and most recently in or around the summer of 2026, after her Millennium physician left the area, Plaintiff Pierce visited the Website to research Millennium physicians and

choose a new primary-care physician from whom she sought care for her own health care needs.

87. During those visits, Plaintiff Pierce opened Millennium physician profiles, including the profile of the physician she ultimately selected, clicked "Schedule Appointment," selected "Yes, I Am A Returning Patient" in response to the Website's patient-status question, and selected "Medicare" as her insurance type.

88. Plaintiff Pierce was physically located in Florida during each of those visits. She accessed the Website from her Acer laptop computer using the Google Chrome browser, and the Trackers' code executed in her browser, on her device, in Florida. She did not use an ad blocker, a virtual private network, or a private or "incognito" browsing mode, meaning the Trackers embedded on the Website were fully operational during her visits.

89. Before interacting with the Website, and at no point during her visits, was Plaintiff Pierce presented with any Terms of Use, cookie banner, pop-up, checkbox, clickwrap, or other request for permission to disclose her communications with Millennium to Google.

90. In the same manner documented above in Sections D and E and in Figures 1 through 7, the physician profiles and physician-specific scheduling pages Plaintiff Pierce requested, and the buttons she clicked—including her selection of "Schedule Appointment," her verbatim answer "Yes, I Am A Returning Patient,"

and her insurance selection, "Medicare"—were intercepted in real time and transmitted to Google, together with her persistent Google Analytics client identifier and Google's DoubleClick advertising cookies. Those persistent identifiers allow Google to connect her communications to the same browser over time and, if she or anyone using that browser later signs into a Google account, to that account.

***All Plaintiffs***

91. Because Millennium deployed the Trackers on its Website, Google intercepted and received Plaintiffs' sensitive health-related communications without their knowledge or consent. At no time, whether before or after the interceptions, did either Plaintiff consent to the interception of his or her communications with Millennium through the Website by Google, or to Millennium enabling Google to access or intercept such information. Each Plaintiff reasonably expected that his or her communications with his or her own physician group about the physicians and care he or she sought, his or her status as a Millennium patient, and his or her insurance were solely between himself or herself and Millennium and would not be transmitted or disclosed to an advertising and analytics company.

92. Each Plaintiff personally supplied these communications—the physicians selected, the patient-status answers, and the insurance selections—directly to Millennium through the Website.

93. Had Plaintiffs known that the physicians they sought, their patient status, and their insurance information would be transmitted in real time to Google's analytics and advertising systems and linked to persistent identifiers, they would not have used the Website in the manner they did. Plaintiffs' information remains in Google's possession. On information and belief, Millennium continues to deploy the Trackers in the same manner, as the demonstrative capture described in Section D confirms. Plaintiffs remain Millennium patients and would continue to use the Website to locate physicians and schedule care if the practices alleged in this Complaint were enjoined.

**J. Tolling and Delayed Discovery**

94. The interceptions alleged in this Complaint are invisible to Website visitors. The Trackers execute silently in the visitor's browser; nothing on the Website's pages discloses that a visitor's physician selection, patient-status answer, or insurance selection is being transmitted to Google; and the transmissions can be observed only with specialized developer tools that ordinary visitors do not use. Millennium's affirmative representations that the Website respects visitors' confidentiality and does not receive funding from advertising further concealed the conduct.

95. Plaintiffs and Class Members did not know, and could not reasonably have discovered through the exercise of reasonable diligence, the facts giving rise to

their claims until shortly before the filing of this Complaint. Any applicable statute of limitations, including for Plaintiffs' Florida-law claims, has therefore been tolled by the delayed discovery doctrine and by Millennium's concealment, and did not begin to run until Plaintiffs discovered, or reasonably could have discovered, the facts giving rise to their claims. As to the ECPA claim, the limitations period does not begin until the claimant "first has a reasonable opportunity to discover the violation." 18 U.S.C. § 2520(e).

## INJURY TO PLAINTIFFS AND CLASS MEMBERS

96. Millennium's procurement of the unauthorized interception of Website visitors' communications has caused actual harm to Plaintiffs and Class Members in multiple ways.

97. *Invasion of Privacy*. The information disclosed—the specific physicians visitors sought, their status as Millennium patients, their insurance and Medicare status, and their steps to schedule care—is among the most private information an individual possesses. Its interception and disclosure to an advertising and analytics company, joined to identifiers capable of identifying the individual, can result in significant embarrassment, stigma, and discrimination. Plaintiffs and Class Members have suffered an invasion of privacy through the unauthorized interception of their electronic communications, violating their reasonable

expectation that their communications with their physician group would remain private.

98. *Commercial Exploitation and Loss of Control.* Millennium caused Plaintiffs' and Class Members' sensitive communications to be disclosed to Google and used the resulting data flows to obtain analytics, advertising, measurement, conversion-attribution, remarketing, and patient-acquisition benefits. Plaintiffs and Class Members thereby lost control over information they had communicated for the limited purpose of locating and scheduling care with Millennium physicians. Personal data—especially health-related information—has significant commercial value, as demonstrated by Millennium's own use of that data for analytics and advertising.

99. *Diminished Confidence in Healthcare Privacy.* The unauthorized interception of Plaintiffs' and Class Members' communications has undermined their ability to freely and confidentially locate physicians and schedule appointments with their own physician group without fear that their activities are being intercepted by third parties.

100. *Risk of Further Use of Intercepted Data.* Once intercepted by Google, Plaintiffs' and Class Members' data is beyond their control and may be further processed, combined with other data, and used for advertising and profiling purposes. By receiving information revealing that a particular user sought a

particular physician, is a patient of a particular physician group, or is a Medicare beneficiary, an advertising platform can associate those health-related facts with the user or the user's profile and use them to deliver targeted advertising over time.

101. *Statutory Injury*. Independent of the above harms, Millennium's violations of the FSCA and the ECPA have caused Plaintiffs and Class Members to suffer statutory injury, entitling them to the remedies provided by law, including statutory and liquidated damages.

## CLASS ACTION ALLEGATIONS

102. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

103. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

> All individuals residing in the United States who, within the applicable statute of limitations period, visited a physician profile page or physician scheduling page on Millennium's Website (www.millenniumphysician.com) and whose electronic communications on those pages were transmitted to third parties by tracking technologies deployed by Millennium (the "Nationwide Class").

104. The Florida Subclass that Plaintiffs seek to represent is defined as follows:

> All residents of Florida who, within the applicable statute of limitations period and while physically located in

> Florida, visited a physician profile page or physician scheduling page on Millennium's Website (www.millenniumphysician.com) and whose electronic communications on those pages were transmitted to third parties by tracking technologies deployed by Millennium (the "Florida Subclass").

105. Together, the Nationwide Class and the Florida Subclass are referred to as the "Class." The FSCA, breach of confidence, and FDUTPA claims are brought on behalf of the Florida Subclass only.

106. Excluded from the Class are: (a) Defendants, their officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (b) Google and its officers, directors, affiliates, legal representatives, employees, successors, subsidiaries, and assigns; (c) any governmental entities; (d) the judge(s) to whom this case is assigned, their immediate family members and staff, and the attorneys for the parties and their staff; and (e) any jurors assigned to this case.

107. Plaintiffs reserve the right to modify, change, or expand the Class definitions based upon discovery and further investigation.

108. *Numerosity.* The Class is so numerous that joinder of all members is impracticable. The Website receives approximately 216,800 visits per month, more than 97% of them from the United States—on the order of 211,000 U.S. visits per month and 2.5 million U.S. visits per year. "Find a Doctor" and "Make an Appointment" are the Website's primary calls to action, and a substantial share of those visits include a physician profile or physician scheduling page. Because

Millennium's practices are concentrated in Florida, a substantial majority of those visits are made by Florida residents while in Florida. The number of individuals whose communications were intercepted by the Trackers during the relevant period is estimated to be in the hundreds of thousands. The precise number and identities of Class Members are within Defendants' and Google's records.

109. *Ascertainability.* The Class is ascertainable because its members can be identified through objective criteria using records maintained by Defendants and third parties. Millennium's web-server logs, its Google Analytics and Google Ads account data, and its patient and scheduling records contain records of visitors to the Website whose electronic communications were intercepted by the Trackers during the applicable limitations period, including IP addresses, geolocation data, cookie identifiers, timestamps, and the specific pages and events involved. Those records also show where each visit was made, which permits membership in the Florida Subclass to be determined objectively.

110. *Commonality and Predominance.* There are questions of law and fact common to the Class that predominate over any questions affecting only individual members. These common questions include:

(a) Whether Millennium implemented the Trackers on its Website;

(b) Whether the Trackers intercepted the contents of Website visitors' electronic communications;

(c) Whether Millennium procured, enabled, directed, authorized, or caused Google to intercept Website visitors' electronic communications;

(d) Whether Millennium obtained Website visitors' consent to the interception of their electronic communications;

(e) Whether Millennium's conduct violated 18 U.S.C. § 2511;

(f) Whether Millennium has been unjustly enriched through its conduct;

(g) Whether Plaintiffs and Class Members are entitled to damages and other monetary relief, and if so, in what amount; and

(h) Whether Plaintiffs and Class Members are entitled to equitable relief, including declaratory and injunctive relief.

111. Common questions specific to the Florida Subclass include:

(a) Whether every party to the communications gave prior consent before the interception, as Fla. Stat. § 934.03(2)(d) requires;

(b) Whether the Trackers acquired the "contents" of Florida Subclass members' communications within the meaning of Fla. Stat. § 934.02(7);

(c) Whether the Trackers are "electronic, mechanical, or other device[s]" within the meaning of Fla. Stat. § 934.02(4), and whether the communications at issue fall outside the exclusion for communications from tracking devices in Fla. Stat. § 934.02(12);

(d) Whether Millennium's conduct violated Fla. Stat. § 934.03;

(e) Whether Millennium breached a duty of confidence owed to Florida Subclass members; and

(f) Whether Millennium's conduct constituted an unfair or deceptive act or practice within the meaning of Fla. Stat. § 501.204.

112. These common questions predominate over individualized issues because Plaintiffs challenge a centralized course of conduct: Millennium's deployment of the same tracking code, through the same Google Tag Manager container, Google Analytics property, and Google Ads account, across the same physician profiles and the same scheduling flow, governed by the same absence of any consent mechanism and the same privacy representations. Liability can be addressed through common technical and documentary proof concerning the code and configurations used, the categories of contents transmitted, the recipient and identifiers involved, Millennium's role in procuring the transmissions, and the disclosures presented to visitors.

113. Individualized questions—such as which particular pages a given Class Member visited, which buttons he or she clicked, or the precise dates of his or her visits—do not predominate, and in any event are answerable from Defendants' and Google's records.

114. *Typicality*. Plaintiffs' claims are typical of the claims of the other Class Members. Plaintiffs and Class Members all visited physician profile or physician scheduling pages on the Website and had the contents of their electronic communications intercepted by Google without their consent, arising from the same practices and course of conduct and based on the same legal theories. Each Plaintiff is a Florida resident who used the Website while physically located in Florida and is a member of both the Nationwide Class and the Florida Subclass.

115. *Adequacy*. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests adverse or antagonistic to those of the Class, and have retained counsel experienced in complex class action litigation, including class actions involving privacy violations, unlawful data collection, and the interception of electronic communications in the healthcare context. Plaintiffs' counsel have the resources, expertise, and commitment to prosecute this action vigorously through discovery, class certification, trial, and any appeals.

116. *Superiority*. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. The damages suffered by many Class Members may be relatively small compared to the burden and expense of individual litigation, making it difficult for Class Members to individually redress the wrongs done to them. Prosecution of separate actions would create a risk of

inconsistent or varying adjudications. A class action provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

117. *Injunctive and Declaratory Relief.* Millennium has acted or refused to act on grounds generally applicable to the Class as a whole, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole under Rule 23(b)(2). Millennium's conduct is ongoing.

118. *Issue Certification.* Alternatively, Plaintiffs seek certification of the common issues identified above under Rule 23(c)(4). Certification of those issues would materially advance the litigation, promote uniform adjudication of Defendants' common conduct, and narrow any individualized questions that may remain after the class-wide issues are resolved.

## CAUSES OF ACTION

### COUNT I
### Violation of the Florida Security of Communications Act
### (Fla. Stat. §§ 934.03, 934.10)
### (On Behalf of Plaintiffs and the Florida Subclass, Against All Defendants)

119. Plaintiffs incorporate paragraphs 1–118 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

120. The FSCA prohibits intentionally intercepting, endeavoring to intercept, or procuring any other person to intercept or endeavor to intercept any electronic communication. Fla. Stat. § 934.03(1)(a). The FSCA is an all-party consent statute: an interception is lawful only where "all of the parties to the

communication have given prior consent to such interception." Fla. Stat. § 934.03(2)(d). A person who intentionally violates § 934.03(1) commits a felony of the third degree. Fla. Stat. § 934.03(4)(a).

121. The FSCA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." Fla. Stat. § 934.02(3). It defines "contents" as "any information concerning the substance, purport, or meaning of that communication." Fla. Stat. § 934.02(7). The FSCA was "designed to protect precisely the information at issue in this case—private medical information." *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *4 (M.D. Fla. Mar. 6, 2025).

122. *Electronic communications.* The transmissions between Plaintiffs and Florida Subclass members and Millennium's Website are "electronic communications" within the meaning of the FSCA because they are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects intrastate, interstate, or foreign commerce. Fla. Stat. § 934.02(12). The communications traveled over the internet between Plaintiffs' devices in Florida and Millennium's Website servers, a system that affects intrastate, interstate, and foreign commerce. They are not communications from an electronic

or mechanical device that permits the tracking of the movement of a person or an object, Fla. Stat. § 934.02(12)(c), or within any other exclusion from the definition.

123. *Device*. The Trackers deployed on Millennium's Website—the Google Analytics and DoubleClick code, and the browsers and servers through which that code operates—are "electronic, mechanical, or other device[s]" within the meaning of Fla. Stat. § 934.02(4). They do not fall within any exclusion from that definition. They are not telephone or telegraph equipment furnished to a subscriber and used in the ordinary course of business, and they do not track the movement of any person or object. They acquire the content of what a visitor tells Millennium.

124. *Contents*. The Trackers intercept the "contents" of Plaintiffs' and Florida Subclass members' electronic communications, not merely routing or addressing information. The "link_click" events transmit the verbatim words of each visitor's answers to Millennium's questions—"Yes, I Am A Returning Patient," "No, I Am A New Patient," "Medicare," "Medicare Advantage," or "Other"—together with the address and title of the physician-specific scheduling page on which Millennium poses those questions, so that the answer and the question it responds to travel to Google together. The physician-specific addresses and titles of the pages a visitor requests identify the specific physician the visitor is seeking. Those transmissions concern the "substance, purport, or meaning" of the visitor's communication within the meaning of Fla. Stat. § 934.02(7). *See W.W. v. Orlando*

*Health, Inc.*, 2025 WL 722892, at *4–5 (holding that transmissions reflecting medical services sought constitute "contents" under the FSCA); *Goldstein v. Costco Wholesale Corp.*, 559 F. Supp. 3d 1318, 1321 (S.D. Fla. 2021) (URLs may constitute "contents" where they reveal substantive information about a user's activity).

125. *Not session replay.* This claim does not rest on the recording of mouse movements, clicks, scrolling, or keystrokes. Millennium's conduct is therefore readily distinguishable from the session-replay technology and the collection of "basic analytic data" in a "generic commercial setting" at issue in *Jacome v. Spirit Airlines, Inc.*, 2021 WL 3087860 (Fla. Cir. Ct. June 17, 2021), and *Goldstein v. Luxottica of America, Inc.*, 2021 WL 4093295 (S.D. Fla. Aug. 23, 2021). The data intercepted here is the confidential, health-related substance of patients' communications with their physician group—the information the FSCA was enacted to protect.

126. *Contemporaneous acquisition.* The interception is contemporaneous with transmission. The Trackers acquire each communication in the instant it is made—within fractions of a second of the page request or click—and transmit it from the visitor's browser to Google in real time.

127. *Situs.* Plaintiffs and Florida Subclass members used the Website while physically located in Florida. The Trackers' code executed in their browsers, on their devices, in Florida, and the interceptions occurred in Florida.

128. *Procurement and intent.* Millennium intentionally procured Google to intercept these electronic communications by deliberately implementing the Trackers on its Website, by configuring a custom "link_click" event that reports visitors' physician, patient-status, and insurance selections to Google verbatim, and by placing its Google Ads conversion and remarketing tag on its physician-specific scheduling pages.

129. *No prior consent of all parties.* Neither Plaintiffs nor any Florida Subclass member consented to the interception, and no consent was obtained before the interception occurred. The Trackers fire on page load and on each click, before any visitor could reach Millennium's footer-linked privacy documents; the scheduling flow presents no consent control of any kind; and Millennium's own transmissions record that no consent signal had been set. Google, the interceptor, is not a party to visitors' communications with Millennium, and Millennium's procurement of the interception cannot supply the consent the statute requires from every party.

130. *Felony.* Millennium's intentional procurement of these interceptions constitutes a third-degree felony under Fla. Stat. § 934.03(4)(a).

131. *Remedies.* Fla. Stat. § 934.10(1) authorizes any person whose electronic communication is intercepted or procured to be intercepted in violation of §§ 934.03–934.09 to recover from the person or entity that engaged in that violation. As

a direct result of Millennium's violations, Plaintiffs and Florida Subclass members are entitled to: (a) preliminary and other equitable or declaratory relief as may be appropriate, Fla. Stat. § 934.10(1)(a), including an injunction preventing Millennium from continuing to deploy the Trackers to intercept their electronic communications without the prior consent of all parties; (b) actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher, Fla. Stat. § 934.10(1)(b); (c) punitive damages, Fla. Stat. § 934.10(1)(c); and (d) a reasonable attorney's fee and other litigation costs reasonably incurred, Fla. Stat. § 934.10(1)(d).

**COUNT II**
**Violation of the Electronic Communications Privacy Act**
**(18 U.S.C. §§ 2511, 2520)**
**(On Behalf of Plaintiffs and the Nationwide Class, Against All Defendants)**

132. Plaintiffs incorporate paragraphs 1–118 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class.

133. The ECPA prohibits the intentional interception of electronic communications and the procuring of any other person to intercept electronic communications. 18 U.S.C. § 2511(1)(a).

134. The ECPA provides a private right of action to any person whose electronic communications are intercepted, disclosed, or intentionally used in violation of 18 U.S.C. § 2511. 18 U.S.C. § 2520(a).

135. The transmissions between Plaintiffs and Class Members and Millennium's Website are transfers of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce, and therefore constitute "electronic communications" within the meaning of the ECPA. 18 U.S.C. § 2510(12). The communications traveled over the internet, an instrumentality of interstate commerce, to and from Millennium's Website and Google's servers.

136. The Trackers are "electronic, mechanical, or other device[s]" within the meaning of 18 U.S.C. § 2510(5). They are not telephone or telegraph equipment, facilities, or components furnished to a subscriber or user by a provider of wire or electronic communication service and used in the ordinary course of business, 18 U.S.C. § 2510(5)(a), and Google's acquisition of visitors' communications for its own advertising purposes is not within the ordinary course of any business of Millennium's.

137. The Trackers intercepted the "contents" of Plaintiffs' and Class Members' electronic communications within the meaning of 18 U.S.C. § 2510(8), for the same reasons set forth above with respect to the FSCA.

138. Google was not a party to Plaintiffs' and Class Members' communications with Millennium. It was an uninvited third party that acquired those communications through code that Millennium procured.

139. Although the ECPA contains a one-party consent exception, 18 U.S.C. § 2511(2)(d), that exception does not apply where a communication is intercepted for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any State. Millennium procured these interceptions for the purpose of committing criminal and tortious acts that are independent of the interception itself, including:

(a) the knowing disclosure and use of its patients' and prospective patients' individually identifiable health information for commercial advantage —through Google's analytics and advertising systems, for conversion measurement, remarketing, audience building, and patient acquisition —in violation of HIPAA's criminal prohibition, 42 U.S.C. § 1320d-6;

(b) the tortious breach of the confidence Plaintiffs and Class Members reposed in Millennium, through the unconsented and unprivileged disclosure of their nonpublic health-related communications to Google, as alleged in Count III; and

(c) the felony procurement of interception without the prior consent of all parties under the law of Florida, where Millennium is headquartered

and where it operates the Website, Fla. Stat. § 934.03(1)(a), (4)(a), and the unfair and deceptive trade practices alleged in Count V.

140. The disclosure and use of individually identifiable health information, and the breach of confidence, are separate from the act of interception itself: they consist of what Millennium caused to be done with visitors' communications after acquiring them—handing them to an advertising company to be joined to persistent identifiers and used for Millennium's and Google's commercial benefit. The transmission of physician, patient-status, and insurance communications with persistent identifiers; Millennium's configuration of custom events to capture visitors' answers to its patient-status and insurance questions; its placement of its Google Ads conversion and remarketing tag on its physician-specific scheduling pages; and its continued receipt of analytics, advertising, and patient-acquisition benefits support the inference of that unlawful purpose. Whether Millennium possessed that purpose and the requisite knowledge is a fact-intensive issue that should be resolved on a complete evidentiary record. *See Stein v. Edward-Elmhurst Health*, 2025 WL 580556, at *4 (N.D. Ill. Feb. 21, 2025); *W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *6–7 (M.D. Fla. Mar. 6, 2025); *Kurowski v. Rush Sys. for Health*, 2023 WL 2349606 (N.D. Ill. Mar. 3, 2023).

141. Millennium's knowing violation of HIPAA is supported by, among other things, its own publication of a HIPAA notice acknowledging that it is

"expressly prohibited from using or disclosing your protected health information for marketing purposes," its representation on its Website that it "will abide by all HIPAA laws," and its awareness of the HHS Office for Civil Rights guidance described above. Plaintiffs rely on HIPAA in this Count only to establish the criminal purpose that renders § 2511(2)(d) inapplicable, as set forth in paragraph 69; they do not assert a claim under HIPAA.

142. That Millennium may have been motivated by commercial purposes does not preclude application of the crime-tort exception. *See Stein*, 2025 WL 580556, at *6 ("The language of the statute gives no hint that conduct falls outside the reach of the statute if a person acted based on financial motivations.").

143. Millennium intentionally procured Google to intercept these electronic communications by deliberately implementing the Trackers on its Website, within the meaning of 18 U.S.C. § 2511(1)(a). Visitors did not consent to Millennium's procurement of third-party interception or to the sharing of the physicians they sought, their patient status, their insurance, their scheduling actions, and associated identifiers for analytics, advertising, remarketing, or conversion-measurement purposes.

144. Millennium was not acting under color of law when procuring these interceptions, and no other exception to ECPA liability applies.

145. As a direct result of Millennium's violations, Plaintiffs and Class Members are entitled to: (a) actual damages, or statutory damages of the greater of $100 per day for each day of violation or $10,000; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs reasonably incurred. 18 U.S.C. § 2520(b)–(c). Plaintiffs and Class Members are also entitled to such preliminary and other equitable or declaratory relief as may be appropriate. 18 U.S.C. § 2520(b)(1).

**COUNT III**
**Breach of Confidence**
**(On Behalf of Plaintiffs and the Florida Subclass Under Florida Law, Against All Defendants)**

146. Plaintiffs incorporate paragraphs 1–118 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass under Florida law.

147. A breach of confidence claim requires an "unconsented, unprivileged disclosure to a third party of nonpublic information that the defendant has learned within a confidential relationship." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 932 (11th Cir. 2020) (en banc). The claim "is rooted in the concept that the law should recognize some relationships as confidential to encourage uninhibited discussions between the parties involved," and traditionally arises in the context of close professional relationships, such as those between patients and medical providers. *Id.*

148. Under Florida law, a confidential relationship exists where "confidence is reposed by one party and a trust accepted by the other, or where confidence has been acquired and abused." *Doe v. Evans*, 814 So. 2d 370, 374 (Fla. 2002). Whether a confidential relationship exists is typically a question of fact not appropriately resolved on a motion to dismiss.

149. *Confidence solicited and trust accepted.* A confidential relationship existed between Millennium and Plaintiffs and Florida Subclass members. Millennium is a physician group. It furnishes medical care; publishes a HIPAA notice representing that "[w]e will maintain the privacy of your protected health information"; represents on its Website that "[c]onfidentiality of data relating to individual patients and visitors" is "respected by this Web Site," that patient-identifiable information may be used or disclosed "[o]nly when the patient has agreed," and that Millennium "will abide by all HIPAA laws"; and invites visitors to use its Website to locate its physicians and to schedule care with them. Millennium thereby solicited visitors' confidence. Visitors reposed confidence in Millennium when communicating with it through the Website for that purpose, and Millennium accepted that trust. Plaintiffs' relationship with Millennium extends well beyond a single interaction with a public-facing website: each is a longtime Millennium patient, and each used the Website on more than one occasion to locate Millennium physicians from whom he or she sought care.

150. *Nonpublic information.* The information Millennium disclosed is nonpublic. It consists of the specific physicians Plaintiffs and Florida Subclass members sought, as reflected in the physician-specific profile and scheduling-page addresses; their verbatim answers to Millennium's question whether they had been seen by a Millennium provider in the last three years; their insurance types, including Medicare status; and their steps to schedule care with Millennium physicians. None of this information was publicly available. It existed only because visitors communicated it to Millennium, and Millennium learned it within the confidential relationship described above.

151. *Disclosure to a third party.* Millennium disclosed that nonpublic information to a third party. By deploying and procuring the Trackers on the Website, Millennium caused visitors' communications to be transmitted in real time to Google, together with persistent cookies and identifiers—including Google advertising cookies and, for visitors signed into Google, cookies associated with their Google accounts—permitting Google to link the communications to the same browser, device, account, or user. Google is an advertising and analytics company that plays no role in furnishing visitors' medical care, and it received the information for its own independent commercial purposes. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *8 (M.D. Fla. Mar. 6, 2025) (allegations that tracking technologies gathered and transmitted a plaintiff's protected health information,

including searches for physicians, medical conditions, and treatment-related information, to Meta and Google sufficiently stated a claim for breach of confidence).

152. *Unconsented and unprivileged.* The disclosures were unconsented and unprivileged. Plaintiffs and Florida Subclass members were never presented with Terms of Use, a cookie banner, pop-up, checkbox, clickwrap, or any other request for permission before their communications were transmitted, and they never authorized Millennium to disclose their health-related communications to an advertising and analytics company. Millennium's footer-linked privacy documents did not obtain consent, represented that the Website respects visitors' confidentiality and does not receive funding from advertising, and promised that health information would not be used for advertising or marketing. No privilege, authorization, or other legal justification permitted these disclosures, and Millennium obtained no authorization from any visitor. Plaintiffs refer to HIPAA in this Count only to describe the confidential character of the information and Millennium's knowledge; they do not assert a claim under HIPAA.

153. *Breach.* Millennium breached the confidence reposed in it. It made the deliberate decision to deploy and procure the Trackers on precisely those functions through which patients seek care—its physician profiles and its scheduling flow—and it did so with knowledge, including from its own HIPAA obligations and the

HHS Office for Civil Rights guidance described above, that doing so transmits protected health information to third parties. Millennium could have declined to place tracking technologies on those functions. Instead it maintained them and accepted the analytics, advertising, attribution, and patient-acquisition benefits the disclosures produced.

154. *Injury*. As a direct and proximate result of Millennium's breach of confidence, Plaintiffs and Florida Subclass members have been injured. They suffered an invasion of privacy, lost control over their confidential health information, sustained a diminished ability to seek care in confidence, and face the ongoing risk that the disclosed information will be further processed, combined with other data, and used for profiling and targeted advertising. Plaintiffs and Florida Subclass members are entitled to compensatory and nominal damages, and to injunctive relief prohibiting Millennium from further disclosing their confidential information without consent.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Florida Subclass, Against All Defendants, Pleaded in the Alternative)**

155. Plaintiffs incorporate paragraphs 2–4, 14–18, 24–60, 79–93, and 102–118 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Nationwide Class or, alternatively, the Florida Subclass under

Florida law. This Count does not incorporate, and does not rely on, the privacy-representation allegations of paragraphs 61–68, the HIPAA allegations of paragraphs 69–78, the injury allegations of paragraphs 96–101, or any allegation of Counts I, II, III, or V.

156. Plaintiffs plead this Count in the alternative to Counts I, II, III, and V, and to the extent Plaintiffs and Class Members are found to have no adequate remedy at law. This Count does not rely on Millennium's violations of the FSCA, the ECPA, FDUTPA, or HIPAA, or on its breach of confidence, to supply the unjust factor. It rests instead on the independent equitable principle that Millennium solicited, received, and retained the benefit of Plaintiffs' and Class Members' valuable personal and health-related data without conferring any compensation in return, and that retaining that benefit without paying its fair value is inequitable irrespective of whether the conduct that produced it is ultimately adjudged unlawful.

157. Plaintiffs and Class Members conferred a benefit directly on Millennium. They themselves supplied their data to Millennium, through Millennium's own Website—selecting the physicians they sought, answering Millennium's patient-status question, and identifying their insurance types—as alleged in paragraph 92. Millennium solicited that data through the design of its scheduling flow, received it directly from Plaintiffs and Class Members, and then put it to use for its own commercial purposes.

158. By implementing the Trackers on its Website, Millennium obtained analytics, conversion-measurement, remarketing, audience-building, advertising-attribution, and patient-acquisition benefits from that data. Those benefits enabled Millennium to measure and improve the efficiency of its advertising, attribute scheduling activity to its advertising campaigns, remarket to prospective patients, and increase the volume of appointments and services, thereby enriching itself at the expense of Plaintiffs and Class Members.

159. Private information, at least in the context of sensitive health-related information, has value. *See W.W. v. Orlando Health, Inc.*, 2025 WL 722892, at *10.

160. Millennium knowingly appreciated, accepted, and retained the analytics, advertising, attribution, audience, and patient-acquisition benefits produced from Plaintiffs' and Class Members' data. Millennium has never compensated Plaintiffs or Class Members for the data that generated those benefits, and it would be inequitable for Millennium to retain the value it received without paying fair value for it.

161. Because Millennium retained a benefit conferred directly by Plaintiffs and Class Members without paying its fair value, Plaintiffs and Class Members are entitled to restitution and disgorgement of the profits, benefits, and other compensation Millennium obtained from the use of their personal and health-related data.

**COUNT V**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**(Fla. Stat. § 501.201, *et seq.*)**
**(On Behalf of Plaintiffs and the Florida Subclass, Against All Defendants — Declaratory and Injunctive Relief Only)**

162. Plaintiffs incorporate paragraphs 1–118 above as if fully set forth herein and bring this Count individually and on behalf of the proposed Florida Subclass.

163. FDUTPA declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). The Act is to be construed liberally to protect the consuming public. Fla. Stat. § 501.202(2).

164. Millennium is engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8): it advertises, solicits, offers, provides, and bills for medical services to consumers in Florida, and it operates the Website to market those services and to acquire patients.

165. *No damages sought.* Plaintiffs seek no damages under this Count and expressly disclaim any recovery of damages under it. Plaintiffs bring this Count solely for the declaratory and injunctive relief that Fla. Stat. § 501.211(1) affords to "anyone aggrieved by a violation" of the Act, together with the attorneys' fees and costs available under Fla. Stat. § 501.2105. Actual damages are not an element of a claim for declaratory or injunctive relief under § 501.211(1); that requirement

applies only to a claim for damages under § 501.211(2). *See Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000).

166. Plaintiffs are persons aggrieved by Millennium's violations: each used the Website to locate Millennium physicians and schedule care and had the contents of those communications disclosed to Google as a result of the practices described below.

167. *Unfair practices.* Millennium's conduct is unfair. Disclosing patients' physician, patient-status, and insurance communications to an advertising and analytics company, and reporting patients' scheduling activity to Google's advertising systems, without notice or consent, offends established public policy protecting the confidentiality of health information, and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Consumers cannot reasonably avoid that injury, because the transmissions occur invisibly, on page load and on each click, before any disclosure could be read, and the scheduling flow offers no means of declining them. The injury is not outweighed by any countervailing benefit to consumers or competition.

168. *Deceptive practices.* Millennium's conduct is deceptive. Millennium affirmatively represents on its Website that "[c]onfidentiality of data relating to individual patients and visitors to a medical/health Web Site . . . is respected by this Web Site," that Millennium "will abide by all HIPAA laws," that "[t]his Site does

not host or receive funding from advertising," and that patient-identifiable information may be used or disclosed "[o]nly when the patient has agreed." Its privacy documents further promise that health information will not be used or disclosed "for advertising, marketing, or other use-based data mining purposes" and that Millennium is "expressly prohibited from using or disclosing your protected health information for marketing purposes." Those representations were likely to mislead a reasonable consumer acting reasonably in the circumstances into believing that his or her communications with Millennium through the Website's scheduling flow would be kept confidential and would not be fed to an advertising company. In fact, Millennium transmits the physicians visitors seek, their patient status, and their insurance to Google's analytics and advertising systems, joined to persistent identifiers and Google advertising and account cookies.

169. *Deception by omission.* Millennium's conduct is also deceptive by omission. Millennium failed to disclose, and failed adequately to disclose, that it transmits the physicians visitors seek, their patient status, and their insurance types to Google. That omitted fact would be material to a reasonable consumer's decision whether to use the Website to locate a physician or schedule care.

170. *Per se violation.* Millennium's conduct is also unlawful, and a practice that violates a statute proscribing unfair or deceptive conduct is a per se violation of FDUTPA. Millennium's procurement of the interception of Plaintiffs' and Florida

Subclass members' electronic communications without the prior consent of all parties violates Fla. Stat. § 934.03 and is a felony under Fla. Stat. § 934.03(4)(a), as alleged in Count I.

171. Plaintiffs refer to HIPAA in this Count only to describe the confidential character of the information and Millennium's knowledge; they do not assert a claim under HIPAA.

172. *Ongoing conduct and need for injunctive relief.* Declaratory and injunctive relief is necessary and appropriate. As the demonstrative capture described in Section D confirms, Millennium continues to deploy the Trackers on its physician profiles and scheduling flow; continues to present no Terms of Use or consent mechanism; and continues to make the representations described above. Plaintiffs remain Millennium patients and would use the Website again to locate physicians and schedule care if these practices were enjoined. Absent an injunction, Plaintiffs, Florida Subclass members, and the consuming public will continue to be subjected to the same practices. The injunctive relief Plaintiffs seek would benefit not only Plaintiffs and the Florida Subclass but also the general public, including every future Florida visitor to the Website.

173. Plaintiffs, on behalf of themselves and the Florida Subclass, are entitled to a declaration that the practices described above violate Fla. Stat. § 501.204, to a

permanent injunction under Fla. Stat. § 501.211(1) restraining those practices, and to reasonable attorneys' fees and costs under Fla. Stat. § 501.2105.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all other Class Members similarly situated, respectfully request that this Court enter judgment against Defendants, jointly and severally, and:

(a) Certify this case as a class action on behalf of the proposed Nationwide Class and Florida Subclass, appoint Plaintiffs as class representatives, and appoint Plaintiffs' counsel as class counsel;

(b) Declare that Millennium's actions, as described herein, violate the FSCA, the ECPA, and FDUTPA and constitute a breach of confidence and unjust enrichment;

(c) Award Plaintiffs and the Nationwide Class statutory damages under 18 U.S.C. § 2520(c)(2) of the greater of $100 per day for each day of violation or $10,000, or actual damages, whichever is greater;

(d) Award Plaintiffs and the Florida Subclass liquidated damages under Fla. Stat. § 934.10(1)(b) computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher, or actual damages, whichever is greater;

(e) Award Plaintiffs and the Florida Subclass compensatory and nominal damages for Millennium's breach of confidence;

(f) Award Plaintiffs and the Class punitive damages under 18 U.S.C. § 2520(b)(2) and Fla. Stat. § 934.10(1)(c);

(g) Award Plaintiffs and the Class restitution and disgorgement of all profits, benefits, and other compensation Millennium obtained from the use of Plaintiffs' and Class Members' personal and health-related data;

(h) Award Plaintiffs and the Florida Subclass preliminary and other equitable and declaratory relief under Fla. Stat. § 934.10(1)(a);

(i) Enter, on behalf of Plaintiffs and the Florida Subclass, a declaratory judgment that Millennium's practices violate Fla. Stat. § 501.204 and a permanent injunction under Fla. Stat. § 501.211(1) restraining those practices;

(j) Enter a permanent injunction under 18 U.S.C. § 2520(b)(1), Fla. Stat. § 934.10(1)(a), and Fla. Stat. § 501.211(1) requiring Millennium to cease procuring the interception of Website visitors' communications without the prior consent of all parties; to disable or segregate the Trackers from its physician profiles, scheduling flow, and other health-related functions unless valid prior consent and authorization are obtained; to cease reporting visitors' physician, patient-status, insurance, and

scheduling selections to third-party analytics and advertising platforms; to request the deletion of improperly transmitted data from Google to the extent within Millennium's control or contractual rights; and to disclose accurately and conspicuously every third party to which it transmits visitors' health-related communications;

(k) Award Plaintiffs and the Class pre-judgment and post-judgment interest;

(l) Award Plaintiffs and the Class reasonable attorneys' fees and costs, as allowed by law, including under 18 U.S.C. § 2520(b)(3), Fla. Stat. § 934.10(1)(d), and Fla. Stat. § 501.2105; and

(m) Grant such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury on all claims and issues so triable.

Dated: November 16, 2026

Respectfully submitted,

By: /s/ Adam A. Schwartzbaum

Adam A. Schwartzbaum, Esq.
Florida Bar No. 93014
SCHWARTZBAUM
14 NE 1st Ave Ste 705
Miami, FL 33132
Telephone: 786-453-8485
Primary Email: adam@schwartzbaum.com
Secondary Email: admin@schwartzbaum.com

*Counsel for Plaintiffs and the Proposed Class*